UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ERMA WOODHULL,
as Personal Representative of the Estate
of Michael Woodhull, deceased,

                                                      Case No. 1:04-cv-203

       Plaintiff,

                                                      Hon. Wendell A. Miles

v

COUNTY OF KENT; SHERIFF LAWRENCE A. STELMA;
CORRECTIONAL MEDICAL SYSTEMS, INC.,
a foreign corporation; CORRECTIONAL MEDICAL
SERVICES, INC., a foreign corporation;
DR. NASIM YACOB, M.D.; DR. DAVID CARREL, D.O.;
DR. NAN ALT, M.D.; CATHERINE WHITE, R.N.;
TAMMY SYSWERDA, R.N.; GWEN LANSER, R.N.;
NANCY SQUIRES, R.N.; KAREN PROUDFOOT, R.N.;
SHARON FISHER, R.N.; C. SYMKO;
THE FAMILY OUTREACH CENTER, a Michigan corporation;
RYAN VEENEMAN; and
CORNERSTONE COMMUNITY MENTAL HEALTH SERVICES,
a Michigan corporation, jointly and severally,

       Defendants.

_____/

OPINION AND ORDER ON CMS DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

       In this removal action asserting claims under 42 U.S.C. § 1983, plaintiff Erma Woodhull,

alleges that the decedent, her son Michael Woodhull, died on November 3, 2001 after receiving

inadequate medical care for a seizure disorder while in custody at the Kent County jail. The

remaining defendants are a corporation, Correctional Medical Services, Inc. ("CMS"), which

entered into a contract with the County to provide medical services to inmates at the jail, in

addition to four individuals – Nasim Yacob, M.D., Daniel Carrel, D.O., Tammy Syswerda, R.N.,

and Gwen Lanser, R.N. – employed as doctors and nurses responsible for providing medical care

at the jail.

The matter is currently before the court on a motion by the remaining defendants (collectively, "the CMS defendants" unless otherwise noted) for summary judgment (docket no. 131). Plaintiff has opposed the motion. For the reasons to follow, the court GRANTS the motion.

**I**

At relevant times, the Kent County jail had a capacity of approximately 1,100 inmates. Typically, it operated at a very full capacity. Nineteen year-old Michael Woodhull was incarcerated at the jail between September 11 and 14, 2001. He left the jail in an ambulance, which took him to a local hospital, where he remained until his death several weeks later on November 3, 2001. He died from complications resulting from a seizure disorder. The evidence appears undisputed that Michael did not receive medication prescribed for his seizures between the time he was admitted to the jail on September 11, 2001 and shortly before he was hospitalized on September 14, 2001.

CMS is a private corporation which has, at all times relevant to this action, contracted with Kent County to provide certain medical services to inmates incarcerated at the Kent County jail. Nasim Yacob, M.D., Daniel Carrel, D.O., Tammy Syswerda, R.N., and Gwen Lanser, R.N. are persons who, at all times relevant to this action, were employed by CMS to provide medical services to inmates at the Kent County jail. Dr. Yacob worked part-time for CMS as a primary care physician at the jail and also served as medical director of the facility. His duties in that

position included seeing inmates at the jail requiring medical attention, in addition to reviewing the jail's medical policies and procedures.  Dr. Carrel, who worked part-time as a primary care physician at the jail, and nurses Syswerda and Lanser, who are registered nurses, were present at the jail and saw Michael Woodhull at various times during his stay between September 11 and 14, 2001.  It is undisputed that Dr. Yacob himself never saw Michael during his stay at the jail, although he did have overall responsibility for managing the care of inmates at the jail.  Although he served as medical director of the jail, Dr. Yacob did not participate in the drafting or negotiation of the agreement between CMS and Kent County.

Michael Woodhull had suffered from intractable seizures since he was a small boy .  His seizure disorder was suspected to have been caused by head trauma which Michael likely sustained when he fell from a moving car; he began having seizures approximately two weeks after the incident.  Numerous treatments undertaken to control Michael's seizures, including multiple surgeries, were apparently unsuccessful.  Michael's condition caused him to become developmentally delayed, or "slow." At some point, when Michael was a teenager, his behavior became aggressive, and his mother Erma Woodhull, the plaintiff in this action, sent him elsewhere to live because she could no longer manage him.

On September 11, 2001, Michael was residing in an adult foster care home in Kentwood, Michigan when he bit a staff member employed at the home.  Police were called, and Michael was arrested by Kentwood police on a charge of aggravated assault 1ate that evening.  Before taking him to jail, however, the police took Michael to St. Mary's Medical Center for an evaluation to determine whether he was an acceptable candidate for admission to jail.  Although it is unclear whether police acted due to concern about Michael's mental state, or his physical

state, or both, what is clear is that Michael was evaluated by a physician before he was taken to jail.

At the time of his examination at St. Mary's on the evening of September 11, 2001, a history was provided that Michael suffered from seizures, mental retardation, diabetes, and an oppositional disorder.  The physician who examined Michael, Dr. Michael Olgren, listed Michael's medications as Depakote, Keppra, Geodon, Bactroban, folic acid, Effexor, Dilantin, and Seroquel.  Although Michael was uncertain whether he had experienced any seizures on that day, he denied having any other physical complaints.  Plaintiff's Exhibit ("Pl. Ex.") 4 (Emergency Care Report).  Dr. Olgren concluded that Michael was in satisfactory condition and was medically stable for jail.  Dr. Olgren executed a "clearance" report, which he apparently provided to police, indicating that Michael was acceptable for admission to jail, with the stipulation to "continue current medications."  Pl. Ex. 5 (Prisoner Medical Clearance Report). The names of the medications, dosages, and administration were not listed by Dr. Olgren in his report.  Michael was discharged from St. Mary's at approximately 11:00 p.m. that night and was taken to the Kent County jail.

During booking at the jail at approximately 11:30 p.m. on September 11, 2001, Michael appears to have denied suffering from any serious medical conditions.  It was, however, noted at booking that Michael was "mentally slow" and that he had been taken to the hospital for a "psyc" (presumably either a psychiatric or psychological) evaluation.  It was also noted that Michael had been jailed on previous occasions.  Pl. Ex. 7 (Inmate Initial Classification).

During booking, Michael was also medically screened by someone employed at the jail. There has been no evidence submitted that whoever interviewed Michael during the screening

process was employed by CMS, or even that the person was medically trained.  However, what is undisputed is that the interview resulted in the entry of a computerized "Jail Medical Screening," which recorded affirmative answers to the following: (1) recent hospital treatment; (2) allergies; (3) mental history; (4) on medication; (5) "psyc" medication; and (6) diabetes.  The Jail Medical Screening recorded negative answers to the following (among other inquiries): (1) under doctor's care; (2) seizures-epilepsy; and (3) under "psyc" care.  However, the Jail Medical Screening also contained remarks noting that Michael took "unk (unknown) meds," "pills for diabetes," and that he "was seen at hospital for psyc evaluation."  Pl. Ex. 8.  Michael therefore denied having seizures.  Nonetheless, because he had diabetes and took medications, the intake screener referred Michael for a medical evaluation.

It is unclear whether Michael was seen by anyone employed by CMS on September 11 or 12, 2001.  However, it is undisputed that nurse Syswerda saw Michael at 1:05 a.m. on September 13, 2001, and that at that time he reported to her that he had a seizure disorder for which he needed medications because he was having seizures.  Syswerda had Michael sign a release so that she could get his medication records from the crisis home.  She also placed him on a "sick call" list and noted that he should be seen by the jail psychiatrist (who is no longer part of this action).  Although there is evidence that the crisis home faxed the medication records to the jail on September 13, there is no evidence that any of the individual CMS defendants saw or took action on these records on that day.

At 5:30 a.m. on the morning of September 14, 2001, one of the deputies on duty at the jail called nurse Syswerda to tell her that Michael was feeling sick and had thrown up. However, Syswerda did not go to see Michael at that time; instead, she made a note that she would pass the

5

information on the next shift, as it was close to time for a shift change.  Dr. Carrel saw Michael at 10: 40 a.m. that morning, approximately five hours after it had been first been reported to nurse Syswerda that Michael had thrown up.  Dr. Carrel observed Michael having petit mal seizures.  He ordered Depakene for the seizures and a Phenergan injection for the vomiting that had been reported earlier.  Dr. Carrel planned to obtain Michael's medication records before taking any further action.

At 11:40 a.m., another deputy noticed that Michael was having a seizure, and she spoke to nurse Lanser.  Lanser instructed the deputy to keep Michael on his side so that he could breathe.  Lanser also apparently contacted Dr. Carrel, who came back to see Michael at 11:50 a.m.  Dr. Carrel by this time had located Michael's medication records and ordered that Michael be given his prescribed seizure medications by mouth; these were given.  Dr. Carrel also ordered an injection of Valium for the seizures, which was also given.

Still, at 12:05 p.m., the deputy notified nurse Lanser that Michael was having yet another seizure and vomiting.  Lanser went to the cell and found Michael unresponsive.  She remained with him for a time, but then later left, instructing the deputy how to position Michael in the event that he had another seizure.  Michael did have another seizure, at 1:20 p.m.  Lanser was eventually called to respond, and this time she sought a doctor's order to have Michael taken to the hospital.

Michael was transported to the hospital by EMS personnel, during which time he continued to have seizures.  At the hospital, Michael was placed on a mechanical ventilator due to breathing difficulties.  He remained on the ventilator until November 1, 2001, when the ventilator was removed after his condition deteriorated.  Michael died on November 3, 2001.

The cause of death was identified as diffuse alveolar damage and aspiration pneumonia due to his seizure disorder.

Plaintiff Erma Woodhull, Michael's mother, was appointed the personal representative of the estate of her son by the Allegan County Probate Court on June 25, 2002.  Plaintiff originally filed this action in Michigan's Kent County Circuit Court in February, 2004, naming as defendants Kent County, the Kent County Sheriff's Department, and Sheriff Lawrence Stelma.  These defendants filed a Notice of Removal on March 24, 2004.  Plaintiff later stipulated to the dismissal of the claims against the Sheriff's Department, which was dismissed from the action with prejudice in an order entered on May 3, 2004 (docket no. 13).

On July 1, 2004, plaintiff filed an amended complaint (docket no. 21) which added a number of defendants, including the CMS defendants.  Plaintiff's amended complaint also added as defendants The Family Outreach Center and Cornerstone Community Health Services, as well as other individuals involved in her son's care at the jail.  Plaintiff later agreed to the dismissal of the claims against Correctional Medical Systems, Inc., Nan Alt, M.D., Karen Proudfoot, R.N., and Sharon Fisher, R.N., and her claims against these defendants have been dismissed with prejudice (docket nos. 53, 89).   Pursuant to a written settlement agreement, plaintiff's claims against a number of the other defendants – including the County, Sheriff Stelma, The Family Outreach Center, Cornerstone Community Health Services, Ryan Veeneman, Cathy White, R.N., and Nancy Squires, R.N. – have also been dismissed (docket no. 126).  Plaintiff's claims against defendant C. Symko have also been dismissed, for lack of service (docket no. 127).

Plaintiff's amended complaint asserts claims against the CMS defendants for violation of 42 U.S.C. § 1983 and "gross negligence" under state law.  As relief, plaintiff seeks both

compensatory and punitive damages.  Plaintiff also seeks declaratory relief that Michael's

constitutional and state law rights were violated.  In addition, plaintiff seeks injunctive relief

requiring the defendants "to change their policies and procedures and training regimen so that

similar violation will not and cannot recur."  First Amended Complaint at 40.[1]

On December 22, 2004, several months after she had filed this action, plaintiff also filed

a second action in state court arising out of these same events.  In that action, plaintiff asserted

malpractice claims against the CMS defendants – and others – based on Michael Woodhull's

treatment at the jail.  Michigan's Kent County Circuit Court dismissed that action as time-barred

by the two-year limitations period applicable to malpractice actions, M.C.L. § 600.5805(6).  The

dismissal of the claims as time-barred was affirmed on appeal.  Woodhull v. Veeneman, No.

262569, 2005 WL 2402041 (Mich. App. Sept. 29, 2005).[2]

On March 27, 2006, this court issued an order declining to exercise supplemental

jurisdiction over plaintiff's state law claims based on gross negligence because Michigan law

was unclear regarding whether it would recognize gross negligence claims based on the same

facts as time-barred malpractice claims which had been dismissed.  Therefore, the claims at issue

in this case are now limited to the federal civil rights claims against the CMS defendants.[3]

---

[1]It is noted that although the amended complaint demands injunctive relief requiring changes at the jail, Michael Woodhull, the alleged victim of the claimed constitutional violation, is deceased and will therefore not be subjected to any future violations.  Nor do the pleadings assert the claims of any other plaintiffs who are live residents of the jail.  In short, the basis for the demand for injunctive relief escapes the court.

[2]The state court's decision in the malpractice action is a proper subject for judicial notice.  See Granader v. Public Bank, 417 F.2d 75, 82 (6th Cir. 1969) ("Federal courts may take judicial notice of proceedings in other courts of record").

[3]In their briefs, the parties appear to assume, based on language contained in a district

(continued...)

Discovery in this case was to have been completed by October 1, 2005.  Stipulated Order Extending Case Management Dates (docket no. 87), ¶ 3 (entered Jan. 10, 2005).  Plaintiff was to identify her experts by April 1, 2005, and defendants by May 1, 2005.  Id.  Plaintiff was to provide written reports of her experts by July 1, 2005, and defendants were to do the same by August 1, 2005.  Id.

The present motion was fully briefed as of December, 2005.  Oral argument on the motion was scheduled and adjourned a number of times before it was ultimately held on June 29, 2006.  For reason(s) which she has not explained, on June 19, 2006, plaintiff filed an additional, second "affidavit" of one her prison medical experts, Corey Weinstein.  On June 26, 2006, CMS filed a motion to strike this late-filed affidavit.  Plaintiff failed to respond to the motion, which the court granted on July 18, 2006 (docket no. 171).


## II

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  In evaluating a motion for summary judgment, the court must

---

[3](...continued)
court decision, that gross negligence is indistinguishable from deliberate indifference, the standard applicable to plaintiff's federal claims.  See Soles v. Ingham County, 316 F. Supp.2d 536, 545-546 (W.D. Mich. 2004).  This language does not does not represent Sixth Circuit law, which holds that "'[g]ross negligence' is not enough to ground liability according to the Supreme Court[.]"  Berry v. City of Detroit, 25 F.3d 1342, 1353 (6th Cir. 1994).  However, because the court has declined to exercise supplemental jurisdiction over plaintiff's claims based on gross negligence, those claims are not addressed on the merits.

determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986). The party moving for summary judgment bears the burden of establishing the non-existence of any genuine issue of material fact and may satisfy this burden by "'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). While inferences drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Only factual disputes which may have an effect on the outcome of a lawsuit under the applicable substantive law are "material." Anderson, 477 U.S. at 248. "The pivotal question is whether the party bearing the burden of proof has presented a jury question as to each element of its case." Hartsel v. Keys, 87 F.3d 795, 799 (6th Cir. 1996).

"The plaintiff must present more than a mere scintilla of evidence in support of her position; [she] must present 'evidence on which the jury could reasonably find for the plaintiff.'" Id. (quoting Anderson, 477 U.S. at 252, 106 S.Ct. at 2512). In addition, "[u]nder Fed.R.Civ.P. 56(e), evidence submitted in opposition to a motion for summary judgment must be admissible." U.S. Structures, Inc. v. J.P. Structures, Inc., 130 F.3d 1185, 1189 (6th Cir. 1997). "Accordingly, hearsay evidence may not be considered on a motion for summary judgment." Hartsel, 87 F.3d at 799; see U.S. Structures, 130 F.3d at 1189 ("Hearsay evidence, as well as evidence which is irrelevant to the issue presented, must be disregarded"). Because, as the CMS defendants have

noted, plaintiff has submitted materials consisting of hearsay or double hearsay – which include the Office of Recipient Rights Investigative Report (Plaintiff's Exhibit 12) and unsigned, unsworn transcripts of statements purportedly made by former Kent County jail inmates to a private investigator (Plaintiff's Exhibits 14, 15, 16, and 17) –  these materials must be disregarded.[4]

As noted above, the court has also stricken the second expert affidavit of Dr. Corey Weinstein.  The court has therefore not considered this affidavit, dated June 13, 2006.[5]  In addition, however, both sides have submitted evidence which includes opinions of other medical and nursing experts.

Fed.R.Evid. 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise," if certain conditions are met.  In the seminal case on the matter, Daubert v. Merrel Down Pharm., Inc., 509 U.S. 579, 113 S.Ct. 2786 (1993), the United

---

[4]Plaintiff has not provided foundational facts establishing that the Office of Recipient Rights Investigative Report falls within Fed.R.Evid. 803(8), which provides a hearsay exception for certain "public" records and reports.  However, even if plaintiff were to establish the applicability of this exception, the report itself contains hearsay not falling within any recognized exception.

[5]In its Order striking Dr. Weinstein's second affidavit (docket no. 171), the court concluded that the affidavit included new matters or opinions not timely disclosed in the written report required by Fed.R.Civ.P. 26(a)(2).  More specifically, paragraphs 27 and 28 of the second affidavit, regarding policies and procedures, training and supervision, and custom and practice of CMS personnel at the jail, were not disclosed in Dr. Weinstein's original "preliminary" report, which plaintiff submitted as Exhibit 38 to her brief in response to the motion for summary judgment.

11

States Supreme Court held that Rule 702 imposes on judges a gatekeeping role to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."  509 U.S. at 589, 113 S.Ct. at 2795.  "Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to [Fed.R.Evid.] 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." 509 U.S. at 592, 113 S.Ct. at 2796 (footnotes omitted).  However, "[a]lthough Daubert specifically dealt with 'scientific' evidence, [courts] have recognized that the 'gatekeeper' analogy 'is applicable to all expert testimony offered under Rule 702.'" First Tennessee Bank Nat'l Assn. v. Barreto, 268 F.3d 319, 334 (6th Cir. 2001) (citation omitted).

Here, the question with respect to both sides' expert opinion evidence is one of relevance, not reliability.  Specifically, both sides' experts have opined regarding "deliberate indifference." Fed.R.Evid. 704(a) provides that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."  However, such opinion evidence must still be helpful to the trier of fact.  As will be noted below, whether or not a defendant acted with deliberate indifference is dependent upon their subjective state of mind.  Farmer v. Brennan, 511 U.S. 825, 839, 114 S.Ct. 1970, 1980 (1994). No one, including an expert, can delve into a defendant's subjective state of mind.  Objective facts and circumstances may provide evidence of a defendant's state of mind, but conclusory statements that a defendant acted with deliberate indifference do not assist the trier of fact. "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments."  United States v. Frazier, 387 F.3d 1244, 1262-1263 (11th Cir. 2004).  Deliberate indifference "is a legal term."  Berry v. City

of Detroit, 25 F.3d 1342, 1353 (6th Cir. 1994).  An expert may not opine on the question of

deliberate indifference because this expresses a legal conclusion.  See id. at 1352-1353 (expert

could not testify that lax discipline policies of police department indicated city was deliberately

indifferent).  The parties' production of conflicting opinions of experts regarding whether the

CMS' defendants' conduct met the standard of care or was "deliberately indifferent" does not

create a triable issue on plaintiff's constitutional claims.  Accordingly, the court has disregarded

those opinions of both sides' experts which express a legal conclusion that a defendant was or

was not deliberately indifferent.  See Defendant's Exhibit H, Expert Report of Lisa Horstman,

R.N., ¶s D(1) and (2) (opining that Syswerda and Lanser were not "deliberately indifferent");

Defendant's Exhibit K, Expert Report of Michael Grebner, M.D.,  ¶D ("there is no evidence of

deliberate indifference"); Defendant's Exhibit L, Expert Report of Leon Pedell, M.D. ("I can

find nothing to suggest any deliberate indifference"); Defendant's Exhibit M, Expert Report of

William Luetcher, M.D., ¶s D(1) and (2) (opining that Drs. Yacob and Carrel were not

"deliberately indifferent"); Defendant's Exhibit N, Expert Report of Gary Trock, M.D., ¶D

(same); Plaintiff's Exhibit 38, "Preliminary Report" of Corey Weinstein, M.D., ¶26 (opining that

jail staff were "deliberately indifferent to the medical needs of Michael Woodhull"); Plaintiff's

Exhibit 40, "Preliminary Report" of Joe Goldenson, M.D., at 18 (opining regarding "deliberate

indifference" and "gross negligence").


### III

To state a claim for relief in an action brought under § 1983, a plaintiff must establish

both that he was deprived of a right secured by the Constitution or laws of the United States and

that the alleged deprivation was committed under color of state law.  E.g., American Mfrs. Mutual Ins. Co. v. Sullivan, 526 U.S. 40, 49-50, 119 S.Ct. 977, 985 (1999).  Where the defendant makes a properly supported summary judgment motion in such an action, the non-moving party must demonstrate a genuine issue of material fact as to these two elements.  Miller v. Calhoun County, 408 F.3d 803, 812 (6th Cir. 2005).  The CMS defendants do not dispute that they acted under color of state law.  What they do dispute is whether plaintiff can establish that Michael Woodhull was deprived of a right secured by the Constitution, namely, the Eighth Amendment.

"It is well settled" that deliberate indifference to the serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain prohibited by the Eighth Amendment proscription against cruel and unusual punishment.  Terrance v. Northville Regional Psychiatric Hosp., 286 F.3d 834, 843 (6th Cir. 2002) (citing Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285 (1976)).  Even though Michael Woodhull was an unconvicted detainee, the Fourteenth Amendment's Due Process Clause operates to guarantee the same Eighth Amendment protections to pretrial detainees.  Miller, 408 F.3d at 812.  As stated in Miller,

> The Supreme Court has adopted a mixed objective and subjective standard for ascertaining the existence of deliberate indifference in the context of the Eighth Amendment:
>> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.
>
> Farmer v. Brennan, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The objective component of the test requires the existence of a 'sufficiently serious' medical need.  Blackmore v. Kalamazoo County, 390 F.3d 890, 895 (6th Cir.2004).  A sufficiently serious medical need is predicated upon the inmate demonstrating that he or she 'is incarcerated under conditions imposing a substantial risk of serious harm.'  Id. (quoting Farmer, 511 U.S. at 834, 114 S.Ct. 1970).

The subjective component, by contrast, requires a showing that the prison official possessed 'a sufficiently culpable state of mind in denying medical care.' Id. (quoting Farmer, 511 U.S. at 834, 114 S.Ct. 1970). Deliberate indifference requires a degree of culpability greater than mere negligence, but less than 'acts or omissions for the very purpose of causing harm or with knowledge that harm will result.' Farmer, 511 U.S. at 835, 114 S.Ct. 1970. The prison official's state of mind must evince 'deliberateness tantamount to intent to punish.' Horn v. Madison County Fiscal Court, 22 F.3d 653, 660 (6th Cir.1994). 'Knowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference.' Id. Thus, 'an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.' Farmer, 511 U.S. at 838, 114 S.Ct. 1970.

Miller, 408 F.3d at 812-813

A medical need is "serious" if it has been diagnosed by a physician as requiring treatment or is so obvious that a lay person would easily recognize the necessity for a doctor's attention. Monmouth County Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987). The CMS defendants do not dispute that Michael Woodhull's seizure condition could be classified as a serious medical need. Therefore, the objective component of plaintiff's claim is satisfied. The true dispute therefore lies in the subjective component of plaintiff's claim of deliberate indifference. Because the subjective component of plaintiff's claim is in dispute, the court must address the facts against each of the CMS defendants individually.

Deliberate indifference "describes a state of mind more blameworthy than negligence," Farmer, 511 U.S. at 835, 114 S.Ct. at 1978, but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Id. Under Farmer, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837, 114 S.Ct. at 1974; see also LeMarbe v. Wisneski, 266 F.3d 429, 435 (6th Cir.2001). "Knowledge

15

of the asserted serious needs or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference." Horn, 22 F.3d at 660.

Emphasizing the subjective nature of this inquiry, the Supreme Court has noted that "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." Farmer, 511 U.S. at 838, 114 S.Ct. at 1979.  The requirement that the official have subjectively perceived a risk of harm and then disregarded it, is meant to prevent the constitutionalization of medical malpractice claims; thus, a plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment. See Estelle, 429 U.S. at 106, 97 S.Ct. at 292 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."); Farmer, 511 U.S. at 835, 114 S.Ct. at 1978 (noting that deliberate indifference "describes a state of mind more blameworthy than negligence"). When a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation. On the other hand, a plaintiff need not show that the official acted "for the very purpose of causing harm or with knowledge that harm will result." Farmer, 511 U.S. at 835, 114 S.Ct. at 1978; see also Horn, 22 F.3d at 660 ("Officials may be shown to be deliberately indifferent to such serious needs without evidence of conscious intent to inflict pain."). Instead, "deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." Farmer, 511 U.S. at 836, 114 S.Ct. at 1978.  Although the plaintiff bears the onerous burden of proving the official's subjective knowledge, this element is

16

subject to proof by "the usual ways, including inference from circumstantial evidence." Farmer,

511 U.S. at 842, 114 S.Ct. at 1981.


**Nurse Syswerda**

Nurse Syswerda worked on the third nursing shift at the jail, which ran from 10:30 p.m.

until 7:00 a.m.  She first saw Michael at 1:05 a.m. on September 13, 2001, after she was called to

his cell by a deputy.  Although there is no evidence that the deputy witnessed Michael having a

seizure, Michael did tell Syswerda that he had been having seizures and that he took medication

for both diabetes and seizures.  Syswerda responded by putting Michael on the sick-call list to be

seen by a medical doctor. (There was no doctor at the jail on third shift, and Syswerda did not

attempt to call one.)  Syswerda also noted that the jail psychiatrist, Dr. Alt, should see Michael

that day.  (Plaintiff's claims against Dr. Alt have been previously dismissed and are not at issue

here.)  Syswerda also took steps so that the jail could obtain Michael's medication records from

the crisis home, having him sign a release to begin the process.

Syswerda testified that she did not consider all seizures to be a medical emergency.

There is in fact a distinction between petit mal and grand mal seizures.  "Petit mal" is defined as

> A form of epilepsy with very brief, unannounced lapses in consciousness. A petit
> mal seizure involves a brief loss of awareness, which can be accompanied by
> blinking or mouth twitching. Petit mal seizures have a very characteristic
> appearance on an electroencephalogram (EEG).
>
> Petit mal (little illness in French) seizures are also known as absence seizures.
> Petit mal seizures take the form of a staring spell: the person suddenly seems to be
> 'absent.'

MedicineNet.com, MedTerms Medical Dictionary, http://www.medterms.com/

script/main/art.asp?articlekey=4854 (Last visited July 27, 2006).  "Grand mal," in contrast, is

defined as

> A form of epilepsy characterized by tonic-clonic seizures involving two phases --
> the tonic phase in which the body becomes rigid, and clonic phase in which there
> is uncontrolled jerking. Tonic-clonic seizures may or may not be preceded by an
> aura, and are often followed by headache, confusion, and sleep. They may last for
> mere seconds, or continue for several minutes. If a tonic-clonic seizure does not
> resolve or if such seizures follow each other in rapid succession, seek emergency
> help. The person could be in a life-threatening state known as status epilepticus.
> Treatment is with antiseizure medications.

> Grand mal means big illness in French and is in contrast to another type of
> epilepsy known as petit mal.

MedicineNet.com, MedTerms Medical Dictionary, http://www.medterms.com/

script/main/art.asp?articlekey=32957 (Last visited July 27, 2006).  There is no indication that at

the time she saw Michael, he had experienced, or Syswerda knew that he had experienced, a

grand mal seizure while he was in the jail.

There is, however, evidence that Syswerda was contacted a second time about Michael

on at 5:30 a.m. on the morning of September 14, 2001, when one of the deputies on duty at the

jail called nurse Syswerda to tell her that Michael was feeling sick and had thrown up.  Syswerda

did not go to see Michael at that time; instead, she made a note that she would pass the

information on the next shift, as it was close to time for a shift change.  According to Syswerda's

testimony, first shift nurses began work at 6:30 a.m., and the first half-hour of the shift would

consist of gathering information from nurses coming off the previous shift.  Therefore, Syswerda

would most likely have passed the information about Michael to first shift nursing between one

and one-half hours after she received the report that he had vomited.  There is no evidence that

Syswerda was subjectively aware of any relationship between petit mal seizures and vomiting,

assuming that there was such a medical connection.  Moreover, there is no dispute that Syswerda did in fact pass on the information about Michael, because he was in fact seen by Dr. Carrel later that morning.

Plaintiff argues that Syswerda should have taken more prompt steps to determine Michael's medications, such as by reviewing his records from a previous jail stay, by contacting the St. Mary's hospital emergency room where Michael had been cleared for admission to the jail, or by contacting his family members (assuming they knew the names and dosages of his medications).  Plaintiff also argues that Syswerda should have made sure that Michael was seen by a doctor immediately; she contends that Syswerda should have viewed Michael's situation as a medical emergency because he had already been without his anti-seizure medication since his admission into the jail.  According to plaintiff, Syswerda's actions were so "woefully inadequate" to amount to no treatment at all for Michael's seizure disorder.

It is unclear how plaintiff believes that "inadequate" treatment satisfies the subjective standard required to support her constitutional claim against Syswerda  – or any defendant, for that matter.  Even if Syswerda's actions were in hindsight insufficient to prevent Michael's descent into grand mal seizures, she did respond to his needs on each occasion: on the first occasion by taking steps to obtain his medication records  and by putting him on the sick call list, and on the second occasion by alerting the next nursing shift – during which a doctor would be on duty – to Michael's vomiting.  Plaintiff herself concedes that Syswerda did not recognize the severity of Michael's condition.  Plaintiff's Brief in Support at 27.  Under the circumstances, it is not possible to say that Syswerda disregarded a risk of serious harm to Michael.  Even if Syswerda committed malpractice, the evidence does not as a matter of law support a finding of

19

deliberate indifference.

**Nurse Lanser**

Nurse Lanser's only involvement with Michael was on September 14, 2001, when she administered medication to him upon the orders of Dr. Carrel and responded twice to reports that Michael was having seizures, at 12:10 and 1:30 p.m.  At 12:10 p.m., Lanser found Michael having a grand mal seizure.  She positioned him for safety and stayed with him until his seizure activity diminished.  According to Lanser, she did not send Michael to the hospital when he had this first grand mal seizure because she had given him an intramuscular injection of Valium only 20 minutes earlier, and she wanted to give the medication an opportunity to work.  Lanser also educated the deputy about seizures; because Michael was in a camera cell, he could be observed by the deputy immediately if he began to have another seizure.  When Lanser was informed at 1:30 p.m. that Michael was having another seizure, she instructed the deputy to call an ambulance.

Plaintiff argues that a jury could determine that Lanser was deliberately indifferent to Michael because she neither contacted the on-call physician for further orders nor called for an ambulance when she first found Michael having a seizure at 12:10 p.m. on September 14. According to plaintiff, Lanser simply left Michael "lying on the floor" of his cell after this first seizure.  However, even assuming that Michael was on the floor when Lanser left him, he was, according to Lanser, awake, alert, and able to position himself.  After this first seizure, the undisputed evidence shows that Lanser, who remained with Michael while he was having a seizure, did exercise her medical judgment and determine to give the medication which she had

20

administered time to work.  Even if plaintiff believes this to be malpractice, Lanser's actions do

not, as a matter of law, amount to deliberate indifference because there is no evidence that she

acted with a sufficiently culpable state of mind.  Therefore, the subjective element of plaintiff's

claim is lacking.  Lanser did respond to Michael's seizures, even though plaintiff questions the

sufficiency of her response.  However, "[m]edical malpractice does not become a constitutional

violation merely because the victim is a prisoner."  Estelle, 429 U.S. at 106, 97 S.Ct. at 292.


**Dr. Carrel**

During the relevant time period, Dr. Carrel worked as a primary care physician at the jail

part-time for CMS for four hours (between 8:00 a.m. and noon) on Thursdays and Fridays.  He

saw Michael only on two occasions on the morning of Friday, September 14, 2001.  Dr. Carrel

observed Michael having petit mal seizures, and he treated him for both the seizures and

vomiting.  After Michael had a grand mal seizure, Dr. Carrel ordered additional medications,

including Valium, to control the seizures.

Dr. Carrel therefore did respond to Michael, even though plaintiff questions whether his

response was medically appropriate.  "Where a prisoner has received some medical attention and

the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second

guess medical judgments."  Westlake v. Lucas, 537 F.2d 857, 860 n.5 (6th Cir. 1976).   As with

nurses Syswerda and Lanser, plaintiff's evidence as to Dr. Carrel could potentially support a

finding of medical malpractice, but under Supreme Court case law "[m]edical malpractice does

not become a constitutional violation merely because the victim is a prisoner."  Estelle, 429 U.S.

at 106, 97 S.Ct. at 292.

**Dr. Yacob and CMS**

Plaintiff does not dispute that Dr. Yacob had no personal involvement in treating Michael at the jail.  She has also not shown that Dr. Yacob was even made aware of Michael's condition or his presence at the jail.  As a result, plaintiff cannot establish the subjective element of her claim against Dr. Yacob.

Plaintiff relies on the fact that Dr. Yacob was the medical director of the jail.  She argues that in his position, he likely could have made certain that some mechanism was in place to ensure that a prisoner – such as Michael – with a serious health condition timely received prescribed medication.  Although a superior officer cannot be held vicariously liable under 42 U.S.C. § 1983 on a respondeat superior theory, see Monell v. Dep't of Social Servs., 436 U.S. 658, 691, 98 S.Ct. 2018, 2036 (1978), he may be found liable under section 1983 on the basis of his own acts or omissions.

One way in which a supervisor's behavior may come within this rule is by formulating a policy, or engaging in a custom, that leads to the challenged occurrence. See Oklahoma City v. Tuttle, 471 U.S. 808, 823-24, 105 S.Ct. 2427, 2436-37 (1985). Even if a supervisor lacks actual knowledge of censurable conduct, he may be liable for the foreseeable consequences of such conduct if he would have known of it but for his deliberate indifference or willful blindness, and if he had the power and authority to alleviate it.  A supervisor may be held liable for what he does (or fails to do) if his behavior demonstrates deliberate indifference to conduct that is itself violative of a plaintiff's constitutional rights. See, e.g., City of Canton v. Harris, 489 U.S. 378, 388, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989).

There are a number of ways to establish a deliberate indifference claim against a

supervisor: establishment of an unconstitutional policy, direct knowledge of the unconstitutional conduct of a subordinate at issue in the case, or the existence of a widespread pattern of violations suggesting that the supervisor should have been aware of the situation.  Plaintiff attaches great significance that Jon McKay, a social worker who worked for Alternative Outreach Team providing mental health services in the jail, at one time stated that it was not uncommon for a new inmate to go up to three days without receiving medication.  Plaintiff sees this as evidence of a "policy."  However, an actual review of McKay's testimony indicates that his statement was based on his experience with inmates being started on *psychiatric* medicine. Plaintiff's Exhibit 13, Transcript of Dep. of Jon McKay, at 34.  According to McKay's testimony, his experience was with psychiatric medicines used for psychiatric symptoms, not medical problems such as seizure disorders.  Id. at 34-35.

Plaintiff also relies on hearsay evidence to support her position that there was an unconstitutional "policy" or "custom" of not timely giving medications to prisoners. Plaintiff does appear to attempt to show some more widespread existence of violations of prisoner's rights, for she has submitted unsworn statements of four former inmates, given to a private investigator, indicating that medications were not timely provided.  She has also submitted a copy of a complaint filed in another lawsuit against CMS making similar allegations. However, even if the court can consider this hearsay evidence, there is no evidence that Dr. Yacob was aware of these particular problems discussed in the hearsay documents. As plaintiff herself has recognized, notice is a salient consideration in determining the existence of a supervisor's liability.  Here, there is no evidence that Dr. Yacob was aware of what happened with these other inmates, even if the court assumes that one of the doctor's

subordinates at some point violated an inmate's rights.  Importantly, three of the incidents described in plaintiff's hearsay evidence happened years after September, 2001 (occurring in 2003 and 2004), when Michael was in the jail.  Two of the alleged incidents occurred years earlier (1996 and 1997).  Two limited instances occurring in a jail with a population of over 1,000 – even assuming that Dr. Yacob or CMS was made aware of these instances – do not amount to a custom or practice and are not sufficient to place these defendants on notice that the jail's policies, procedures, or training were inadequate.

Had plaintiff provided the proper proofs, she might have made a case against Dr. Yacob or CMS.  However, if there is a case to be made against either or both of these defendants, plaintiff has not made it.  Instead of pointing to actual admissible evidence, plaintiff relies on hearsay, on evidence pertaining to other defendants no longer a part of the action, or on her pleadings.  However, this is insufficient to create a genuine issue for trial.  Simply put, plaintiff lacks admissible evidence of a de facto policy or custom of ignoring inmates medication needs.

Plaintiff also incorrectly relies on national standards, adopted by a private organization, the National Commission on Correctional Health Care.  Plaintiff argues that the jail's noncompliance with such standards is evidence of deliberate indifference.  However, non-compliance with the policies of a private organization does not amount to deliberate indifference, even if one assumes that CMS adopted these standards as its own policies.[6]

There is some indication that – late in the case – plaintiff realized that she had neglected

---

[6]Plaintiff has not provided the court with a copy of Kent County's contract with CMS. Thus, there is no evidence that the County bestowed full policy-making authority on CMS or Dr. Yacob.  Dr. Yacob testified that his duties included "review [of] policies and procedures of the facility."  Plaintiff's Exhibit 42, Dep. of Dr. Yacob, at 8.  However, Dr. Yacob did not testify that he established the jail's medical policies and procedures.

the aspect of her case directed to the liability of Dr. Yacob and CMS.  Specifically, her belated

submission of a second affidavit of one of her experts, Dr. Weinstein, appears to be directed to

addressing elements of her case that were lacking, including policies, procedures, and failure to

train.  However, the additional paragraphs of the affidavit, which has been stricken, are too little,

too late to create a genuine issue of material fact on the liability of Dr. Yacob and CMS.


### Conclusion

The motion of the CMS defendants for summary judgment is granted.

So ordered this 3rd day of August, 2006.


 /s/ Wendell A. Miles
Wendell A. Miles
Senior U.S. District Judge